IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| *Plaintiff*, | ) ) ) No. 15 CR 756-2 |
| v. | ) ) Judge Virginia M. Kendall |
| CHARLES FEARS, | ) ) |
| *Defendant*. | ) ) |

### MEMORANDUM OPINION AND ORDER

Over two years after pleading guilty to sex trafficking charges and after receiving his Probation Officer's Report prior to sentencing, Defendant Fears seeks to withdraw his guilty plea and to dismiss the indictment. (Dkts. 442, 445). Both motions are denied because during a thorough and exhaustive change of plea hearing, Fears admitted under oath that he understood the potential sentence, was working with his attorneys, and was prepared to proceed. Based on crimes of violence of which he was convicted, Fears remains a danger to the community and therefore his renewed motion for bond is also denied. (Dkt. 459).

### BACKGROUND

In 2016, Charles Fears was indicted for conspiracy to engage in the sex trafficking of minors and for sex trafficking adult and minor victims by force, fraud and coercion in violation of 18 U.S.C. §§ 1591(a)-(b) and § 1594. (Dkt. 51). On February 26, 2018, Fears pleaded guilty to a superseding information that charged him with conspiracy to engage in sex trafficking of minors and by force, fraud, and coercion, in violation of 18 U.S.C. § 1594(c) (Count One), and sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a) and (b)(2) (Count Two) pursuant to a

1

plea agreement. (Dkt. 233). Fears, who has been represented by counsel throughout the entirety of these proceedings, admitted in his plea agreement, that from about 2012 through in or about 2014, Fears and his co-defendant Samuel Nichols "operated a sex trafficking business through which they used force, fraud, and coercion to cause females to engage in commercial sex acts and then turn the proceeds over to Fears and Nichols. (*Id.* at 3–4). Fears further admitted in his plea agreement that he and Nichols "had multiple females working for their sex trafficking business at any given time, including minors." (*Id.* at 4). The plea admitted that Fears and Nichols worked together to recruit women for their sex trafficking business, including underage women. (*Id.*). Fears and Nichols "made false promises to the females in order to recruit them, such as promising to help them save money for an apartment or car, when in reality Fears and Nichols took nearly all the money the females made from commercial sex acts." (*Id.*).

Fears admitted in his plea that he and Nichols "primarily operated their sex trafficking activities out of motels in the Chicago area, where they lived with the females who worked with them. The motels included national chains, such as the Red Roof Inn, Extended Stay and Motel 6. Fears and Nichols used proceeds of the sex trafficking operation to pay for the motel rooms." (*Id.* at 4–5). Fears also admitted that he carried a gun while engaging in sex trafficking activities, and that he and Nichols conducted sex trafficking activities out of strip clubs. (*Id.* at 5). Fears admitted that he and Nichols used the proceeds of the sex trafficking to purchase alcohol and drugs to induce the women to engage in commercial sex acts, and also used to proceeds to purchase supplies including condoms, cellular phones, and hygiene products for the females. (*Id.*). Fears also admitted that he and Nichols used the proceeds to fund their rap group, the Hit Squad. (*Id.*). Fears admitted that he and Nichols advertised commercial sex acts through the website "Backpage.com."

2

(*Id.*). Fears also admitted that he and Nichols "used violence and threats of violence against the females who worked for them to cause them to engage in commercial sex acts." (*Id.* at 6).

Fears admitted to committing these and other acts in his plea agreement. In addition to these facts, the plea agreement contained Sentencing Guidelines calculations. The agreement included both the government's and Fears anticipated appropriate Guidelines calculations. For example, the agreement provided that:

> the government's position is that the anticipated offense level is 43, which, when combined with the anticipated criminal history category of II, results in an anticipated advisory sentencing guidelines range of life imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Defendant also acknowledges that he is subject to a statutory minimum sentence of 10 years 'imprisonment

(Dkt. 233 at 12). The parties agreed that the guidelines calculations in the agreement were "preliminary in nature" and that "the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation." (*Id.* at 13). The parties also agreed that: "Each party is free to recommend whatever sentence it deems appropriate." (*Id.* at 13). Fears acknowledged that "further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case" and "that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing." (*Id.* at 12–13). Further, the agreement states: "It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea." (*Id*. at 13–14).

The agreement states that "Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he

understands and voluntarily accepts each and every term and condition of this Agreement," and Fears and his attorney, along with the government, signed the agreement. (*Id*. at 24).

This Court also held a change of plea hearing. (Dkt. 232). The Court placed Fears under oath and asked him questions regarding his competency, his representation, and finally the plea agreement. At the hearing, Fears stated that he had reached the eleventh grade, that he had no mental health conditions, that he did not take daily medications, and that he had not consumed drugs or alcohol prior to the hearing. (Dkt. 337 at 4–6). Fears confirmed that he had read the plea agreement and that he had discussed it with his attorney and asked his attorney questions, which his attorney had answered. (*Id.* at 7, 9). The Court also asked whether Fears needed more time to review the agreement, to which he responded that he had enough time and responded "Yes," when the Court asked, "So you feel ready to go forward this morning." (*Id.* at 9–10). Fears confirmed that he was pleading guilty voluntarily after consulting with his lawyers and that nobody was forcing him to do so. (*Id.* at 10).

At the hearing, the Court noted the disputed guidelines calculations and asked Fears, "Do you understand that if the government were to win all of its guideline agreements, that they would be arguing for a sentence of life in prison? Do you understand that?" (*Id.* at 13). Fears responded that he understood. (*Id.*). The Court went on to explain, "Okay. Now, your attorney, of course, is going to challenge that particular enhancement. And there is an agreement here that each side can argue whatever sentence each side deems appropriate. So Mr. Clarke can argue anything that is above 10 years and below life. Now the government has the same ability to do nothing more than – nothing less than the 10 years and then up to life. Is that your understanding?" (*Id.* at 14). Fears said, "Yes, I understand." (*Id.*).

4

The government read the factual basis for the plea, including the above-quoted language regarding Fear's conduct. (*Id.* at 21–25). The Court then asked Fears whether there was anything in the facts recounted by the government that Fears disagreed with. (*Id.* at 25). Fears said "No," but the Court noted "You [Fears] seem to be pausing. So if there is, turn to Mr. Clarke, show him what your concern is, and then we'll come back and I'll ask you the question again." (*Id.* at 25–26). The Court gave Fears time to confer with his attorney, which he did. (*Id.* at 26). When he had finished conferring with his attorney, the Court asked again, "Anything you disagree with?" Fears responded, "Yeah, I'm fine." (*Id.*). Fears then pleaded guilty to Counts One and Two of the superseding information and the Court accepted the plea. (*Id.*).

## **DISCUSSION**

### I.     Motion to Withdraw Plea

Fears now seeks to withdraw his plea. "After a district court accepts a guilty plea, it may allow a defendant to withdraw that plea before sentencing if he can show a 'fair and just reason for requesting the withdrawal.'" *United States v. Redmond*, 667 F.3d 863, 870 (7th Cir. 2012) (quoting Fed. R. Crim P. 11(d)(2)(B)). "This includes when the plea was not entered into voluntarily, knowingly, and intelligently, with sufficient awareness of the relevant circumstances and likely consequences." *Id.* (internal quotation marks omitted). "There is no absolute right to withdraw a guilty plea," and "[b]ecause the defendant's statements given under oath during the plea colloquy are presumed to be true, he bears a heavy burden of persuasion in showing that a fair and just reason for withdrawing the guilty plea exists." *Id.* (internal quotation marks omitted). Courts do not look favorably on arguments for withdrawing a guilty plea that conflict with statements made at the time the plea was entered. *See United States v. Beck*, 718 Fed. App'x. 429,

5

443 (7th Cir. 2017); *United States v. Standiford*, 148 F.3d 864, 868–69 (7th Cir. 1998) (A defendant's statements at a plea colloquy are presumed truthful).

In his motion, Fears contends that he pleaded guilty due to ineffective assistance of counsel. In particular, Fears writes that he pleaded guilty due to pressure placed on him by his attorney, Mr. Clarke. (Dk. 442 at 3). Fears writes that "Robert G. Clarke made many false promises to Defendant to coerce the Defendant into signing the plea deal, one in particular being that they would charge Defendants only with adults and that all the other counts [sic] go away and Defendant will be out by age 30 and shall only be sentenced to his mandatory [sic] minimum of 10 years." (*Id.* at 3). Fears also claims that Mr. Clarke advised him that if he did not plead guilty, defendant would surely be sentenced to over 25 years' imprisonment. (*Id.* at 2).[1]

None of these assertions comport with the thorough change of plea hearing conducted by the Court. Of course, ineffective assistance of counsel "…can render a plea agreement involuntary, and is therefore a valid basis for withdrawing a guilty plea," but to show ineffective assistance of counsel in this context, "a defendant must show that (1) the attorney's performance was objectively unreasonable; and (2) but for the attorney's deficient performance, the defendant would not have pled guilty." *United States v. Barr*, 960 F.3d 906, 918 (internal quotations and citations omitted); *see also United States v. Harper*, 934 F.3d 524, 529 (7th Cir. 2019) ("[A] plea, even one that complies with Rule 11, cannot be 'knowing and voluntary' if it resulted from ineffective assistance of counsel. Thus, if the record shows that [the defendant] received ineffective assistance of counsel, his admission of guilt does not bar him from withdrawing the guilty plea."). But here, the Court will not "upset a plea solely because of *post hoc* assertions

---

[1] Fears does not raise any claims that Marilyn Miller, the other counsel on his case, was ineffective.

from a defendant about how he would have pleaded but for his attorney's deficiencies." *Barr*, 960 F.3d at 918 (*quoting Lee v. United States*, 137 S. Ct. 1958, 1967 (2017)).

The record repeatedly demonstrates that Fears did not raise any issues with Mr. Clarke's representation, that he had a clear understanding of the what the ultimate sentence could be, that he understood which counts he was pleading guilty to, and there was no force or coercion that made him enter the plea. Fear made statements under oath to the Court reflecting his voluntary and knowing entry of the plea. Fears stated under oath that he had been having regular discussions with his attorneys and that he was satisfied with his counsels' representation. The Court asked Fears, "Okay. Now, I've had many statuses. And Mr. Clarke and Ms. Miller have come regularly. They have told me that they're working through the discovery and that they've been speaking with you. Have you been having regular discussions with them about your case?" Fears replied "Yes." The Court then asked: "Okay. Now, during the time that you've had these discussions, have they explained to you the charges in the indictment?" Fears replied, "Yes. They have explained everything to me, ma'am." The Court asked, "And then did you ask them questions about the things that they were providing you?" To which Fears responded, "Yes, I did. And Robert actually, when I speak to him, he goes into the Ebonics of everything so I -- I understand." The Court then asked, "So he goes through, explains to you what each thing is?" Fears replied, "Yes." (Dkt. 337 at 6–7).

Not only this, but Fears was asked if Mr. Clarke explained the sentencing guidelines to him, to which he replied that Mr. Clarke had. (*Id.* at 9). The Court asked Fears, "Okay. And all of the time that you've been working with Mr. Clarke and Ms. Miller, are you satisfied with their performance with you?" Fears replied, "Yes, I'm satisfied." The Court asked, "Okay. Satisfied

7

that they've represented your best interests?" Fears replied, "Yes." (*Id.*). Fears then said he understood his plea agreement and did not need more time to review.

Fears also stated under oath that he entered his plea voluntarily and that he was not under any pressure. His argument that he was pressured is unsupported by the record. The Court asked Fears, "[I]s anyone forcing you to go into this plea agreement and enter it today?" Fears replied, "No." The Court asked, "Is it your own personal decision to do that." Fears replied, "Yes." The Court then asked, "And that's after talking with Mr. Clarke and Ms. Miller." Fears replied, "Yes." (Dkt. 327 at 10).

The record is wholly devoid of any evidence to suggest that Mr. Clarke (or Ms. Miller) was ineffective or that he pressured Fears to take the plea agreement. Fears had ample opportunity before the Court to raise any concerns with Mr. Clarke's representation or to express that his plea was less than voluntary. *See, e.g., United States v. Davey*, 550 F.3d 653, 656-57 (7th Cir. 2008) (record does not support defendant's claim that his attorney was "ineffective because he pressured [defendant] into pleading guilty based on a faulty assessment of the likely sentence" because defendant testified at the hearing that he was satisfied with his attorney's representation and that no one had coerced his plea); *United States v. Santos*, 189 Fed. App'x 534, 536 (7th Cir. 2006) ("To the extent [defendant] asserts that his attorney's advice coerced his plea, thus rendering it involuntary, this is belied by his own statement at the plea colloquy that no one forced, threatened, or intimidated him into pleading guilty. . . . [D]efendant acknowledged throughout the colloquy that he understood the consequences of pleading guilty; thus his attorney's prediction that he would be sentenced to a longer term if he went to trial does not render his plea unknowing or involuntary.").

Next, Fears claims that he only pleaded guilty because Mr. Clarke made "false promises" to him, that Mr. Clarke told him he would be sentenced to only 10 years' imprisonment if he pleaded guilty, and that Mr. Clarke told him that if he did not plead guilty, Fears would be sentenced to over 25 years' imprisonment are also completely unsupported by the record. (Dkt. 442 at 2–3). The Court thoroughly advised Fears of the statutory guidelines and the maximum penalties while going through the plea agreement:

> "And I'm going to walk you through what the maximum penalties are for that. And in your plea agreement, if you've got it in front of you, it is – it's on page 7. So it carries a maximum sentence of life imprisonment. And it also carries a maximum fine of $250,000. That's to Count One. There's also a term of supervised release of not more than five years. Count Two carries a maximum sentence of life, but it also has a statutory mandatory minimum sentence, which means I cannot go below that sentence. It's ten years. Do you understand that?"

(Dkt. 327 at 8–9). Fears indicated that he understood these terms, as well as the additional terms pertaining to restitution and the special assessment. (*Id.*). The Court also made sure that Fears understood how the sentence would be calculated and imposed. (*Id.* at 13–14). "Other than his own self-serving assertions, his motion lacks any proof that he did not understand his guilty plea or that he was pressured into a guilty plea through false promises," therefore Fears's claims as to false promises are meritless. *United States v. Jones*, 381 F.3d 615, 618-19 (7th Cir. 2004) (conclusory claims made in a motion to withdraw plea was denied because it was contradicted by statements made at the plea colloquy). The Court ensured that Fears understood the guidelines and his possible sentencing and Fears indicated his full comprehension.

Turning to Fear's last claim that he should be permitted to withdraw his plea because he pleaded "guilty out of pressure due to him having 30 out of the 90 required discovery discs in his possession," the record is devoid of any support for this statement. (Dkt. 442 at 2). Fears was asked about his access to discovery materials and whether he had been having regular discussions

9

with his attorneys on discovery and Fears did not raise any concerns. (Dkt. 327 at 6–7). This claim is also undermined by the record.

The Court can find no support that Fears's guilty plea was involuntarily given or that his counsel was so ineffective as to render his plea involuntarily given. Also, it is difficult to come up with a motive on the part of his seasoned defense attorneys to coerce Fears into a guilty plea when both attorneys were ready to proceed to trial up until the date of the plea. The Court had afforded Fears two appointed attorneys due to the volume of the case and he admitted working with them each time they visited. Fears's allegations fail to satisfy the heavy burden of persuasion to overcome the presumption of truth that attaches to his statements at the change of plea hearing. *See United States v. Graf*, 827 F.3d 581, 584 (7th Cir. 2016) ("A defendant's motion to withdraw is unlikely to have merit if it seeks to dispute his sworn assurances to the court.");*United States v. Messino*, 55 F.3d 1241, 1248-49 (7th Cir. 1995) ("The district court is generally justified in discrediting the proffered reasons for the motion to withdraw and holding the defendant to [his] admissions at the Rule 11 hearing."). Fears's motion to withdraw his plea of guilty is therefore denied.

## II. Motion to Dismiss the Indictment

Fears also moves to dismiss his indictment. (Dkt. 442, 445). This Court has already ruled on Fears's previous Motion to Dismiss the Indictment (Dkt. 143), stating that "An indictment suffices if it: (1) adequately states all of the elements of the crime charged; (2) informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecution for the same offense." (*Id.* at 1 (citing *United States v. Anderson*, 280 F.3d 1121, 1124 (7th Cir. 2002)). Defendant's counsel at the time acknowledged that the indictment was an adequate charging document. (*Id.* at 1–2).

Defendant seeks to challenge the adequacy of the evidence presented to the grand jury and claims the evidence was based on speculation and conjecture. But Fears's arguments are conclusory, speculative and wholly without support. The record once again belies this allegation because many of the witnesses who testified at trial had testified in the grand jury and during the course of the trial the transcripts of those witnesses were used during examination. Even assuming Fears's motion were based in fact, the Court can "dismiss the indictment only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violation." *U.S. v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005). Fears cannot show either that the indictment was based on false information, nor does he make any arguments that he was prejudiced by any allegedly false information. Again, his counsel has already admitted that the indictment was sufficient. For the reasons discussed in this Court's earlier ruling, the Court denies Defendant's Motion to Dismiss the Indictments.

### III.   Restorative Motion for Bond

Fears brings a Restorative Motion for Bond claiming that he is having difficulty communicating with counsel while imprisoned and that he is at a heightened risk for a serious case of COVID-19 because he has Chronic Obstructive Pulmonary Disorder ("COPD"). (Dkt. 459). This Court previously denied Fears's emergency motion for release. (Dkt. 432). The instant motion is governed by the same statute as his emergency motion for release: 18 U.S.C. § 3143(a), which governs release of a defendant between conviction and sentencing. Where a defendant has been found guilty of a violation of 18 U.S.C. § 1591, and Fears has pled guilty to such a charge, subsection (a)(2) provides that the court shall detain the defendant unless two conditions are satisfied. 18 U.S.C. § 3143(a)(2). Release would require defendant to establish (1) "a substantial

11

likelihood that a motion for acquittal or new trial will be granted"; or (2) that the government seeks "no sentence of imprisonment." 18 U.S.C. § 3143(a)(2)(A)(i)-(ii). Second, if one of these two prongs is met, the judicial offer must find "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community." 18 U.S.C. § 3143(a)(2)(B). For the reasons discussed in the Court's denial of Fears emergency motion for release, the Court denies his restorative motion for bond.[2]

## CONCLUSION

Fears has failed to show that his plea was not made knowingly, intelligently, and voluntarily. The Court therefore denies Defendant's motion to withdraw his plea. [Dkts. 442, 445]. The Court also denies Defendant's Restorative Motion for Bond. [Dkt. 459].

Virginia M. Kendall
United States District Judge

Date: October 14, 2020

---

[2] In its denial of Fear's Emergency Motion for Release, the Court stated as to the 18 U.S.C § 3143: "There is not a likelihood that he would have his judgment reversed, he is facing a significant sentence and the Government is seeking life in prison, and he is a danger to the community based on his previous convictions. The Court heard the evidence of the trafficking organization at the trial of his CoDefendant and then at the Change of Plea Hearing for Fears. That evidence includes incidents of trafficking in minors, physical abuse of victims, and the drugging of victims to get them to perform sex acts with others. The latest charges to which Fears pled guilty occurred while he was on release for promoting prostitution showing that he immediately went back to the same crimes while under a court's order. Therefore, he is both a danger to the community from his actions and has shown a pattern now of violating Court's orders. Fears mentions that he has bronchitis and is therefore at greater risk of contracting COVID-19 than others in the facility; however, he fails to provide any support for that contention. (He is currently represented by an attorney, but this motion was filed pro se.) It is true that the MCC has tested a number of detainees in the last week who have tested positive for COVID-19. It is also true that the vast majority were asymptomatic and had not complained of being ill. Of those who have been ill at the MCC, only seven have needed hospitalization to date and of those seven, four have already been released and are recovering. There have been no deaths in the facility from COVID-19 thankfully. This cannot be said for the outside community."