UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | No. 15 CR 756-2 |
| v. | |
| | Judge Virginia M. Kendall |
| CHARLES FEARS | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits this position paper as to sentencing factors, and asks the Court to sentence defendant CHARLES FEARS to a sentence of 30 years' incarceration, which is warranted pursuant to 18 U.S.C. § 3553(a).

## I. FACTUAL BACKGROUND

Defendant worked with co-defendant Samuel Nichols to operate a sex-trafficking organization with impunity for years. From 2012 through at least 2014, defendant trafficked and conspired to traffic women and children throughout the Chicagoland area by force, threats of force, and coercion. As a result of his conduct, defendant was charged by superseding indictment with one count of conspiring to engage in sex trafficking and four substantive counts of sex trafficking. Dkt. 51. Defendant pleaded guilty to an information charging him with a sex trafficking conspiracy and with trafficking Minor B (Ciara), knowing and in reckless disregard of the fact that Minor B was under the age of 18. Dkts. 233, 236. As part of his plea agreement, admitted to working with co-defendant Samuel Nichols and co-

conspirator Brandon Wright to traffic a number of minor and adult victims, including by using violence against those victims. Dkt. 233.

Specifically, defendant and co-defendant Nichols operated a sex trafficking business through which they used force, fraud and coercion to cause women and girls to engage in commercial sex acts and then turn the proceeds over to them.[1] Eventually, the conspirators' sex trafficking business got so large that they hired a third person. From approximately July 2013 and continuing through at least approximately October 2014, Brandon Wright worked for Nichols and at times for the defendant as a driver in the sex trafficking operation.

Co-defendant Nichols was the leader and manager of the sex trafficking operation. Nichols, who is approximately eight years older than defendant Fears, referred to the defendant as "son" and the defendant referred to Nichols as "pops." Nichols taught the defendant how to engage in sex trafficking. Nichols hired Wright to assist their operation, and it was Nichols who taught defendant how to use backpage.com to advertise commercial sex acts. Nichols typically had five or more females working for him at any given time, including minors. Defendant typically had approximately two females working for him at any given time, including minors. Nichols, Fears, and their victims often stayed in the same hotels.

The defendant and Nichols' sex trafficking operation not only lasted for a long period of time, but also included a staggering number of victims. The defendant has

---

[1] A detailed summary of the evidence – including a summary of the evidence as to each victim – is included in the Government's Version of Offense and the Government's Response to Defendant Samuel Nichols' Motions for New Trial (Dkt. 312).

admitted that during the 2012 to 2014 time period, he trafficked Minor B (Ciara), Individual A (Michelle, aka "Molly"), Individual C (Betty Jo, aka "Becky"), Individual D (Marzett, aka "Celeste"), and Individual K ("Ms. Perfect"[2]). Dkt. 233 at 4. During this same time period, Nichols trafficked Minor A ("Unique"), Individual A (Michelle, aka "Molly"), Individual C (Betty Jo, aka "Becky"), Individual D (Marzett, aka "Celeste"), Individual E (Candace, aka "Cherish"), Minor C[3] (Kadeejah, aka "Coco"), Individual G (Christine, aka "Lil Baby"), Individual I (Kaila, aka "Sexy"),[4] Individual K ("Ms. Perfect"), and Individual L (Asia, aka "Stallion"). Some of the victims switched from working for Fears to working for Nichols, and vice versa.

While both the defendant and Nichols had multiple adult victims, they also trafficked children as young as thirteen years old. Minor B, Ciara, is discussed below in detail and began working for Fears when she was sixteen years old. Minor C, Kadeejah or "Coco," worked for both Nichols and Fears when she was thirteen years old.

On average, defendant made an estimated $600-$700 per day, while Nichols made up to $2,000 a day. Nichols' trafficking activities were stopped only after he was arrested in late October 2014. Once Nichols was arrested, Fears was not deterred, and continued trafficking some of the victims until he was arrested in January 2016.

---

[2] The government has not identified Ms. Perfect's true name.

[3] Kadeejah is referred to as Minor C in Brandon Wright's plea agreement, and is referred to as Individual H in the Complaint (Docket No. 1, 15 CR 756).

[4] Candace is referred to as Individual E in the Complaint and Kaila is referred to as Individual I. Wright and the victims testified extensively about Candace and Kaila at trial. They were Nichols' "bottoms," working for him for years and enduring routine beatings from Nichols.

The defendant and Nichols used the proceeds of sex trafficking to purchase alcohol and drugs, which they provided to their victims to cause them to engage in commercial sex acts. They also used the proceeds to fund their rap group, the Hit Squad, and buy themselves brand-name clothes. While the victims sacrificed their bodies and health to have sex with countless men each day, Nichols and the defendant spent the day playing video games, smoking marijuana, and working on Hit Squad music. Nichols and Fears also took a trip to Atlanta, funded by money that the victims earned engaging in commercial sex acts. While there, they posed with their proceeds:



G.V. Ex. 8.

Defendant used violence, coercion, and manipulation to cause women and children to engage in commercial sex acts for his own profit. The victims explained that, of the two, Nichols was more violent than Fears – but Fears also regularly used violence against the victims: slapping, kicking, and punching them. For example,

Minor B (Ciara) recalled harrowing details of how Fears abused her. She explained that if she broke Fears's rules, such as taking too long with a customer, he put her head into the toilet. Additionally, when Fears learned that Ciara had not seen customers one night as he had instructed her, Fears threw her on the floor and stomped on her hand, breaking her finger. Ciara testified at trial that this beating made her feel "like nothing." Ex. 1, Part B, page 72. Defendant also forced Ciara to have unprotected sex with him on more than one occasion.

At least once, Nichols and Fears teamed up to assault a victim, Ms. Perfect, together – throwing her on the ground, punching her and kicking her. Fears was also present when Nichols beat the victims, including a time when Nichols beat Candice while Candice was pregnant.

In addition to violence, Fears and Nichols gave their victims alcohol and drugs to induce them to perform commercial sex acts. Fears and Nichols also made promises to the victims that they did not intend to keep. For example, when Fears took Ciara's earnings from her, he told her he would buy her a car – which never happened.

Defendant and Nichols treated these women and children like a commodity. When one of them decided they no longer wanted one of the victims working under them, they simply "traded" the victim to the other. In his law enforcement interview, defendant referred to victims by derogatory nicknames, like "Blow Job [Victim First Name]" or "Dirty Tennis Ball," apparently a reference to the victim's short hairstyle. When talking about Nichols' relationship with one of the victims, defendant said that

"once you stick [have sex with] certain women," the "want it, they want to keep it, which is dealing with you cheating on them or watch you be with another girl or walk around on the street and still let you come home and stick them." G.V. Ex. 9 at 3.

In short, defendant and Nichols controlled their victims physically and psychologically. They used violence to intimidate and to coerce. Defendant treated his victims with complete disrespect. He profited from the commercial sex acts performed by the victims, not sharing those proceeds with them. It is nearly impossible to comprehend the trauma defendant inflicted on his victims.

## II.    GUIDELINE CALCULATION

### A.    Probation Office's Calculations

The Probation Office, in the PSR, concluded that the offense level is 40. *See* PSR ¶ 113. The government identified a typographical error in paragraph 54, where the base offense level for Ciara/Minor B should have been listed as 34, but was instead listed as 30. It is the government's understanding from consultation with the Probation Office that this was a typographical error. Therefore, if Ciara/Minor B's offense level is corrected, there would be a total offense level of 38 for this victim. This change would impact the Grouping analysis in paragraphs 105 and 106. If no other changes were made to the Probation Office's calculations, each other victim's Group would be at least nine offense levels lower than Ciara's. Accordingly, no units would be assigned under Guideline § 3D1.4 and the adjusted offense level would be 38.

Once that adjustment is made, using all other adjustments from the PSR, the Probation Office's total offense level would be 43.

The Probation Office further concluded that defendant has 1 criminal history point, which establishes a criminal history category of I. *See* PSR ¶ 188. The resulting Guideline range, taking into account the corrected offense level of 43, would be a sentence of imprisonment for a term of defendant's life. *See* Guideline § 5A1.1.

Based upon the statutes of convictions, the maximum penalty is life imprisonment and the minimum term of imprisonment as to Count Two is ten years. In addition, pursuant to 18 U.S.C. § 1593(a), defendant owes mandatory restitution to the victims in the amount of their earnings for the commercial sex acts they performed, which conservatively totals at least approximately $1,649,343.12.

## B.    The Government's Guidelines Calculations

The government's Guidelines calculations are set forth in Exhibit A; the government computes defendant's total offense level to be 48; the Guidelines disregard offense levels higher than 43 and treat those offense levels as 43. *See* U.S.S.G. § 5A1.1 cmt. 2. The calculations in Exhibit A correct an error in the calculation of the Grouping adjustment in the Government's Version of the Offense. Therefore, the advisory Guidelines range would be imprisonment for defendant's life under the government's calculations.

For purposes of the Guidelines calculations, the victims included in the calculations are only the victims that defendant admitted in his plea agreement to trafficking, as well as an additional victim, Kadeejah, who indicated to law

7

enforcement that she was trafficked by defendant when she was a minor. The government believes that it would also be appropriate to include the other victims who were trafficked by Nichols during the charged conspiracy. However, given defendant's Guidelines calculation, because of the grouping rules and the number of victims, additional victims would not alter the defendant's total adjusted offense level.[5] The government's position is that those additional victims are victims for purposes of restitution.

## C.    Acceptance of Responsibility

The government agrees with the Probation Office's determination that defendant should not receive any reduction for acceptance of responsibility. PSR ¶¶ 110-112. According to the Guidelines, "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense" then his offense level may be decreased by two levels. U.S.S.G § 3E1.1(a). The burden is on a defendant to demonstrate acceptance, *United States v. Castaneda*, 906 F.3d 691, 695 (7th Cir. 2018), consistent with the list of non-exhaustive factors identified in Application Note 1 to the Guideline. *See* U.S.S.G § 3E1.1(a), cmt., n. 1.

A defendant who has not truthfully admitted offense conduct has not clearly demonstrated acceptance of responsibility for his offense. U.S.S.G. § 3E1.1(a), cmt, n.1(A); *see also United States v. Larkin*, 171 F.3d 556, 558 (7th Cir. 1999) ("[I]n order to receive [a § 3E1.1(a)] reduction, a defendant must truthfully admit the conduct

---

[5] Under the government's calculations, defendant is already receiving the largest Grouping adjustment possible – an addition of five offense levels for having "more than 5" total units. *See* U.S.S.G. § 3D1.4.

compromising the offense(s) of conviction." (quotation omitted)). A defendant is not entitled to an adjustment for acceptance of responsibility simply because he entered a guilty plea.[6] *United States v. Collins*, 796 F.3d 829, 835 (7th Cir. 2015).

Defendant did plead guilty in this case, admitting offense conduct that violated Counts One and Two of the superseding information. Afterwards, he repeatedly denied he engaged in that conduct – including attempting to withdraw his guilty plea. *See, e.g.*, Dkts. 442, 445. In his post-plea filings, defendant has denied offense conduct. Defendant denied that there were minors involved in his offense. Dkt. 445 at 5 ("That being said there are no minors involved in the defendant Fears part [of the offense]"). Defendant denied using violence against Minor B/Ciara and others, even though multiple victims testified about such violence under oath at trial and/or in the grand jury. Dkt. 415 at 1 (stating that he pleaded guilty to charges "that [he] did not commit" as he "never beat or hit" Michelle, Betty Jo, Marzett, Jameela, Ciara, or Ms. Perfect.) Specifically related to Ciara, the victim for Count Two, defendant stated, "[y]es, Ciara was a working girl who never worked for me or gave me a red cent thats my word." *Id.* at 3. Defendant has repeatedly denied offense conduct.

This Court denied defendant's motions to withdraw his guilty plea, finding his representations were contrary to his sworn statements under oath during the plea and there was "no support" for defendant's claim that his plea was involuntary. Dkt.

---

[6] Defendant's plea agreement stated that the government would recommend a reduction for acceptance of responsibility as long as the "defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1" and the government does not receive additional evidence in conflict with such a recommendation. Dkt. 233 at 10. Defendant's post-plea actions do not reflect an acceptance of responsibility.

462 at 10. The Seventh Circuit has repeatedly affirmed the denial of an acceptance of responsibility for defendants who move to withdraw their guilty pleas alleging that their statements during the plea colloquy were untrue. *See Collins*, 796 F.3d at 836 (citing cases). In this case, defendant has denied offense conduct and alleged that his statements admitting the offense conduct under oath at his plea hearing were false. Accordingly, he should not receive a reduction for acceptance of responsibility.

### D. Criminal History Category

The government agrees with the Probation Office as to defendant's criminal history calculation, which is Criminal History Category I. PSR ¶ 184.

The Probation Office's calculation differs from the plea agreement on the issue of whether defendant's 2013 conviction for possessing alcohol in public as a minor warrants a criminal history point. Dkt. 233 at 11-12; PSR ¶ 120. While the government initially believed this conviction warranted a point, the government now agrees with the Probation Office that this conviction should not yield any criminal history points under Guideline § 4A1.2(c)(2). PSR ¶ 120.[7] Public possession of alcohol by a minor is a Class A misdemeanor, punishable by up to one year of imprisonment. *See* 235 ILCS 5/6-16; 730 ILCS 5/5-4.5-55.

Under Guideline § 4A1.2(c)(2), sentences for "Juvenile status offenses and truancy" and sentences for "Public intoxication" are not to be counted. Public possession of alcohol by a minor is not specifically listed. Therefore, the Guidelines

---

[7] The PSR cites Guideline § 4A1.1(c)(2) instead of 4A1.2(c)(2), but the government believes that is a typographical error.

instruct the Court to use a "common sense" approach to determine if the offense is similar to the listed offenses, including:

> (i) a comparison of punishments imposed for the listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

U.S.S.G. § 4A1.2 cmt., n.12(A).

Illinois law sets a significant maximum punishment for this offense – up to one year of imprisonment. This is significantly higher than another similar offense involving minors, possession of tobacco by a minor. At the time of defendant's conviction, 2013, possession of tobacco by a minor was a petty offense, with a first offense punishable by a fine of up to $25 or 15 hours of community service. *See* 720 ILCS 675/1(a-7) (2013), 720 ILCS 675/2 (2013). The undersigned could not locate a public intoxication statute in the state of Illinois.[8] The significant punishment afforded by Illinois law for defendant's offense weighs in favor of affording criminal history points.

When evaluating the factors, Seventh Circuit also counsels this Court to look at the "*actual* punishment imposed" for the offense in question. *United States v. Bravo*, 26 F.4th 387, 397 (7th Cir. 2022). Defendant was initially sentenced to 24 months' supervision; after he violated the terms of his supervision, he was sentenced to 1 year conditional discharge with 8 days' imprisonment. PSR ¶ 120. This factor cuts both ways. Twenty-four months' supervision could be viewed as a significantly

---

[8] Under Illinois law, "[N]o county, municipality, or political subdivision may adopt or enforce any law that includes being intoxicated as the sole basis of the offense." 301 ILCS 55-15.

long term of supervision, but the sentence here was also significantly less than the maximum possible punishment.

The elements of the offense are that (1) a person under the age of 21, (2) has an alcoholic beverage in their possession, (3) in public.[9] The second two elements are similar to what would be commonly accepted as the elements of public intoxication. Similarly, the first element is similar[10] to what would constitute a "Juvenile status offense." The elements weigh against affording a criminal history point for this conviction. So too does the factors related to the level of culpability and the degree to which the commission of this offense indicates a likelihood of recuring conduct.

While factors point in both directions, out of an abundance of caution, the government does not seek to include a criminal history point related to defendant's 2013 possession of alcohol by a minor conviction. *See Bravo*, 26 F.4th at 395 (the offense must be "*more severe*" than the excluded crimes listed in Guideline § 4A1.2(c). Accordingly, the proper Criminal History Category is I.

---

[9] Specifically, at the time of the offense, the statute read "Any person under the age of 21 years who has any alcoholic beverage in his or her possession on any street or highway or in any public place or in any place open to the public is guilty of a Class A misdemeanor." 235 ILCS 5/6-16 (2012).

[10] Some circuits have held that a juvenile status offense is one that criminalizes conduct for minors under the age of 18 – not for adults aged 19-20. *See, e.g., United States v. Landa*, 642 F.3d 833, 838 (9th Cir. 2011). However, in *Landa*, the Ninth Circuit found that a California statute criminalizing a minor driving under the influence was similar to a juvenile status offense with respect to the element that required the defendant to be under 21, even though the defendant "was an adult at the time of his arrest." *Id*. at 838. Ultimately, the Ninth Circuit affirmed the district court's award of criminal history points to the offense in question because one of the elements was driving under the influence of alcohol – which is not similar to the categories in Guideline § 4A1.2. *Id*.

Under both the government's calculations and the Probation Office's calculations, with a total offense level of 43, defendant's advisory guidelines range would be life imprisonment no matter his criminal history category.

### D.     Government's Objections to the PSR

The government objects to the Probation Office's conclusions as to the base offense level for each of the victims unique to Count One, the conspiracy count.[11]  It is the position of the Probation Office that the base offense level for these victims is 14 under Guideline § 2G1.1(a)(2) because the count of conviction is conspiracy, not a violation of Section 1591.  PSR ¶¶ 63-65, 73, 81, 89, 97.  It is the position of the government that the base offense level for the adult victims should be 34 pursuant to Guideline § 2G1.1(a)(1), and the base offense level for Minor C should be 30 pursuant to Guideline § 2G1.3(a)(2).

Guideline § 2G1.1, which is applicable to the trafficking of adult-aged victims, provides that the base offense level is "(1) 34, if the offense of conviction is 18 U.S.C. § 1591(b)(1); or (2) 14, otherwise."  The Guideline applicable to a conviction for trafficking a minor-aged victim is U.S.S.G. § 2G1.3, which provides that the base offense level is: "(1) 34, if the defendant was convicted under 18 U.S.C. § 1591(b)(1); (2) 30, if the defendant was convicted under 18 U.S.C. § 1591(b)(2); (3) 28, if the defendant was convicted under 18 U.S.C. § 2422(b) or § 2423(a); or (4) 24, otherwise."

The Guidelines' reference to § 1591(b) is shorthand for the type of conduct involved in the offense.  Section 1591(b) is a penalty provision and it sets the penalty

---

[11] The government does not object to the Probation Office's finding that the base offense level for Minor B/Ciara was 34; Minor B is the basis of the conviction for Count Two.

for the offense involved trafficking of a minor or trafficking by force, fraud, or coercion. By definition, an offense under § 1591 will always fall within one of these two categories.

Section 2X1.1 of the Guidelines provides that the base offense level for a conspiracy conviction not covered by a specific offense guideline is the "base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." A substantive offense is defined as "the offense that the defendant was convicted of . . . conspiring to commit." U.S.S.G. § 2X1.1 cmt., n.2.

The commentary to the Guidelines provides an example: if a defendant is convicted of conspiracy to commit bank robbery, the base offense level would be the base offense level for the bank robbery, 20 (Guideline § 2B3.1(a)), plus a two-level enhancement because the robbery involved a financial institution (Guideline § 2B3.1(b)(1)). *See* U.S.S.G. § 2X1.1 cmt., n.2. Additional enhancements from Guideline § 2B3.1 would then be added if they involved conduct that was "specifically intended or actually occurred." *Id.* That may include, for example, a three-level enhancement for brandishing a firearm (Guideline § 2B3.1(b)(2)(E)) or an enhancement for a specific amount of loss (Guideline § 2B3.1(b)(7)). The result of this cross-reference would be that the defendant would have the same Guideline offense level as if he had been convicted of the substantive offense. The same result should take place in the instant case. Defendant was convicted of conspiring to traffic minors as well as trafficking by force, fraud, and coercion. Therefore, because there is no

14

specified base offense level for § 1594, § 2G1.1(a)(1) should be applied for defendant's trafficking of adults by force, fraud, and coercion, and § 2G1.3(a)(2) should be applied for defendant's trafficking of Minor C.

The Probation Office agrees that §§ 2G1.1 and 2G1.3 apply, but argues that the Court should apply § 2G1.1(a)(2) to the adult victims and § 2G1.3(a)(4) to the minor victims. The PSR's calculation results in a base offense level of 14 for defendant's trafficking of the adult victims which is *20 levels* lower than the base offense level for his trafficking of Minor B/Ciara. Similarly, the PSR's calculation of a base offense level for Kadeejah was 24, which is *10 levels* below the base offense level for trafficking Ciara, even though it is the exact same conduct. In other words, in Count One, defendant was charged with conspiring to traffic minor and adult aged victims by force, threats of force, and coercion—which includes the same conduct he was charged with committing in Count Two. If he had been convicted of the substantive offense and not conspiracy for these victims, this conduct would have been punishable under § 1591(b)(1) for the adult victims, or § 1591(b)(2) for Kadeejah.

Thus, there is no reason that Count One should have a significantly lower base offense level than Count Two. To do so would ignore the clear direction of Guideline § 2X1.1, which requires that the base offense level for conspiracy be the same as the base offense level from the guideline for the substantive offense. *Cf., United States v. Monem*, 104 F.3d 905, 908 (7th Cir. 1997).[12]

---

[12] In *Monem*, the Seventh Circuit rejected defendant's claim that the base offense level for conspiracy to commit money laundering should be lower than the base offense level for the substantive crime. *Id.* at 908. The Court held that, pursuant to § 2X1.1, the base offense level should be the same: "Section 2X1.1(a) of the Guidelines . . . points us to the base offense

The Third Circuit agrees, holding that "[c]onspiracy convictions under 18 U.S.C. § 1594(c) require the sentencing court to determine the base offense level for the substantive offense," which for trafficking by force, fraud, or coercion would be a base offense level of 34. *United States v. Sims*, 957 F.3d 362, 365 (3d Cir. 2020). Similarly, the Eighth Circuit found that the base offense of the relevant provision of Section 1591 should apply to a sex trafficking conspiracy conviction based on the "unambiguous" direction in Guideline § 2X1.1 to apply the base offense level for the underlying substantive offense. *United States v. Carter*, 960 F.3d 1007, 1014 (8th Cir. 2020); *see also United States v. Valdez*, 2021 WL 3478402, at *5 (11th Cir. Aug. 9, 2021) ("the plain language of § 2X1.1(a) requires us to apply § 2G1.3 to Valdez's conviction for conspiracy to violate § 1591(a) where conduct satisfying § 1591(b)(2) occurred, as though he had actually committed the substantive offense under §§ 1591(a) and (b)(2)"). The Ninth Circuit has endorsed the approach proposed by the Probation Office. *United States v. Wei Lin*, 841 F.3d 823 (9th Cir. 2016). It is the government's position that *Wei Lin* was wrongly decided, consistent with the Third

---

level for the substantive offense that was the object of the conspiracy, in this case 18 U.S.C. § 1956(a)(1)(A). The base offense levels for substantive offenses of money laundering are provided by Section 2S1.1, which requires a base offense level of twenty-three if the defendant is convicted under 18 U.S.C. §§ 1956(a)(1)(A), (a)(2)(A), or (a)(3)(A) and a base level of twenty if the defendant is "otherwise" convicted of money laundering. . . . This approach is consistent with the overall treatment of conspiracy offenses in the Guidelines, which provide that the base offense levels for various types of conspiracies should be determined by reference to the underlying offenses that are the objects of the conspiracies. Appellant's suggestion would therefore create an anomaly: a defendant convicted of conspiracy to commit money laundering would receive a more lenient sentence than a defendant charged with the substantive offense of money laundering." *Id.*

Circuit's holding that the "*Wei Lin* opinion would lead to absurd results." *Sims*, 957 F.3d at 634.

Therefore, the base offense level for victims Ciara, Michelle, Betty Jo, Marzett and Ms. Perfect should all be 34, and the base offense for Kadeejah should be 30. *See* Ex. A.

## III.   APPLICATION OF THE SENTENCING FACTORS

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[13]  In order to determine the sentence to impose, the court must consider the statutory factors listed in § 3553(a)(1)-(7).  One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements.  § 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  For the reasons set forth below, consideration of the statutory sentencing factors reveals that a sentence of 30 years' incarceration is warranted.

---

[13]Those are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

**A.** **The Seriousness and Nature and Circumstances of the Offense Weight Strongly in Favor of a Sentence of Life Imprisonment**

The depth and breadth of defendant's crimes are horrific. He and Nichols trafficked at least 12 women and children over a period of many years. While these women and children had sex with dozens of strangers, defendant took the money they earned and used it to fund his own extravagant lifestyle. He caused his victims to live in a climate of fear, coercion, and manipulation.

Defendant's crimes have created a toll for the victims that will be difficult to ever imagine, quantify, or truly understand. Their lives are forever impacted by the time they spent under the control of the defendant. The government is in the process of contacting each victim to see if she wants to make a statement at sentencing; if a written statement is received, the government will provide a copy to the Court and to defendant upon receipt.

The psychological scars to the victims will last a lifetime. Dr. Sharon Cooper, who testified as an expert in this case, has previously testified about the long-term mental health effects that trafficking often has on minor victims, including: post-traumatic stress disorder ("PTSD"), depression, secondary attention deficit hyperactivity disorder, and chronic medical conditions such as ulcers that are caused or impacted by mental health issues. Portions of Dr. Cooper's testimony in prior proceedings about the mental health impacts were attached as Exhibits A and B to co-defendant Nichols's sentencing memorandum. Dkt. 338. Dr. Cooper opines that, according to research in the area of trafficking, PTSD occurs in females who have

18

been prostituted between 67-87% of the time.[14]  *See* Dkt. 338, Ex. A at 2.  In addition to forever impacting the victims' mental health, defendant has also placed his victims at much higher risk of being trafficked or exploited again.  Victims of sex trafficking often experience low self-esteem, self-blame, guilt, and feelings of depression, worthlessness, and shame, making them more vulnerable to the next sex trafficker.

The Seventh Circuit has recognized the effect of offenses involving minors and the use of force, fraud, and coercion to cause victims to engage in commercial sex acts. *See United States v. Shannon*, 110 F.3d 382, 386 (7th Cir. 1997) ("The younger child is likely to have poorer judgment, less knowledge about sex, and less money, all of which deficits will make it less likely that she will use or insist that her partner use effective measures to prevent pregnancy and disease. She is also less likely to be a responsible expectant mother, so there is danger to her fetus."); *United States v. Carson*, 870 F.3d 584, 591 (7th Cir. 2017) ("Victims of sex trafficking may make decisions that look voluntary at times due to the incredible weight of coercion and force upon them. And they may make some decisions along the way that are truly voluntary. Those decisions do not take away from the fact that they have been held hostage, coerced, forced, or threatened to engage in commercial sexual acts.").

---

[14] Dr. Cooper's opinions are consistent with a report published by the U.S. Department of Health and Human Services entitled "Evidence-Based Mental Health Treatment for Victims of Human Trafficking," dated April 15, 2010 and available at https://aspe.hhs.gov/report/evidence-based-mental-health-treatment-victims-human-trafficking.  According to the report, there are significant levels of posttraumatic stress disorder ("PTSD") among trafficking victims.  The report also describes a study which found that victims of human trafficking report a number of anxiety and depression symptoms, including: fearfulness (85%), hopelessness about the future (76%), and feeling depressed or very sad (95%).

For all of these reasons, the incredibly seriousness nature of defendant's crimes warrant a significant period of incarceration.

## B. Defendant's History and Characteristics Demonstrate that a Sentence of 30 Years' Incarceration is Warranted

Defendant's history and characteristics are both aggravating and mitigating.

In mitigation, defendant had an extremely troubled childhood.[15] His mother was neglectful, and defendant faced periods where he lacked enough food to eat. PSR ¶ 144. He only met his father once, at age 11, and "often longed for a father" since his father was never in his life. *Id*. Fears himself was a victim of abuse, detailed in the PSR. PSR ¶ 146. Fears met Nichols when Fears was 11 and Nichols was 19; Nichols worked at a shoe store and would give Fears shoes and money. PSR ¶ 147. Eventually, Nichols referred to Fears and Fears's best friend as "son," and they referred to Nichols as "pop." PSR ¶ 147. When Fears's best friend was murdered, Nichols remained an important figure in Fears's life. PSR ¶ 147.

When defendant committed the charged crimes, he was approximately 18-21 years old. Defendant got involved in the sex trafficking business after he was encouraged to do so by Nichols, to whom defendant looked up to as a brother/father-type figure. It was Nichols who taught him "the ropes" in the business, and defendant modeled his behavior after the horrible example set by Nichols. Defendant does have only has 1 criminal history point, which is a comparatively light criminal history compared to his co-defendant and other sex trafficking defendants in this district.

---

15 It is the government's understanding that a mitigation report may have been completed for defendant, though the government does not have a copy of such a report.

Defendant also pleaded guilty in this case, sparing the victims of having to face him at trial. Shortly after his plea, he expressed remorse to this Court, writing that he hoped his children did not "make the same mistakes I made." Dkt. 245 at 1.

In aggravation, defendant's crimes were horrific. He was not deterred by his interactions with law enforcement, including his arrest and conviction for promoting prostitution in 2011 (PSR ¶ 119), his 2015 arrest for promoting prostitution (PSR ¶ 141), and Nichols' arrest in 2014 following Nichols' kidnapping of a child belonging to one of the victims. He continued trafficking victims even while Nichols was incarcerated out-of-state in 2014-2015.

Troublingly, defendant has also sent correspondence to this court minimizing and denying his behavior, and blaming the victims. Examples are listed above of his denials of offense conduct. His victimization rhetoric included the following from a 2020 filing:

> The defendant Fears also implies that this crime is 100% gender bias, being so known commercial sex actress(s) can indulge in commercial sex acts long before and after meeting "you" but as soon as they are busted for non related/related prostitution charges all they have to do is point the finger at the male and he's automatically labeled as pimp.

Dkt. 445 at 3. Defendant continues to blame the victims throughout this filing, summarizing it near the end by saying the victims "played puppet master as the defendant played puppet being controlled by the alleged victims using their sex, deals, and lifestyle" to recruit him. *Id.* at 8.

In 2021, defendant's rhetoric continued, including the following statement in a letter to the court:

> THEY PRAISE HUE HEFNER FOR HAVING PLAYBOY WITH A MASION THAT WAS FILLED WITH 100 WOMEN COMMITTING ALL SORTS OF CRIMINAL ACTIVITIES, YET AND STILL HE WAS NOT LABLED AS A PIMP BUT RATHER ICONIC, INNOVATIVE AND INGENIUS, WHILE ME JUST A UP AND COMMING RAP ARTIST FROM CHICAGO'S POVERTY STRICKEN STREETS IN THE PLIGHT OF BEING HOMELESS PARENTLESS AND UNEDUCATED HAS BEEN MADE RESPONSIBLE FOR A HANIOUS CRIME OF LIES

Dkt. 493 (spelling errors in original). Defendant's whole perception of his role in the crimes is completely off-base. His minimizations make it more likely that he will reoffend in the future, given he does not understand or accept the seriousness of his crimes and his role in those crimes.

**C.    The Need to Promote Respect for the Law, Afford Adequate Deterrence, and Protect the Public from the Defendant All Weigh Strongly in Favor of a Sentence of 30 Years' Imprisonment**

**i.    Specific Deterrence, Protecting the Public, and Respect for the Law**

For years, defendant profited off the commercial sex acts of his victims, using violence to keep them in line and keep them earning money for him. He was not deterred by his run-ins with law enforcement, nor his co-defendant's run-ins with law enforcement. Even after he pleaded guilty in this case, he continued to minimize and deny his conduct. If defendant thinks his conduct was not wrong – or if wrong, not that big of a deal – he is at much higher risk of recidivism.

**ii.    General Deterrence and Respect for the Law**

Defendant's crimes were brutal, but unfortunately, were not unique. Dr. Cooper's testimony during Nichols' trial demonstrated that Nichols and Fears are part of a much larger culture of sex trafficking. Defendant's violence is a standard

part of that culture. Sex traffickers operate with impunity in the Chicagoland area and around the country.

Sex trafficking cases are difficult to investigate and prosecute. They depend on finding victims who are willing to cooperate with law enforcement. Such victims are rare; most, like defendant's victims, have been taught by traffickers not to talk to the police. Even those who are willing to cooperate have problems that make their cooperation difficult, including transience, drug addiction, and mental health issues.

The culture of impunity surrounding sex trafficking must end. If there is hope of deterring sex trafficking, the sentences in cases that result in guilty verdict must be significant. Congress has recognized this, creating stiff mandatory minimum penalties and significant Guideline ranges. Traffickers operating today should receive the message that if you traffic children and women by force in the Chicagoland area, the sentence will be severe.

### D. The Need to Avoiding Unwarranted Sentencing Disparities

Defendant argues that, nation-wide, in fiscal year 2020, defendants who are sentenced under Guideline § 2G1.3 are sentenced to an average sentence of 134 months' incarceration. Dkt. 505 at 1-2. However, these defendants are not necessarily "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Guideline § 2G1.3 covers a wide range of conduct, including violations of 18 U.S.C. § 2422 – which does not require any physical contact with a minor actually take place. *See, e.g. United States v. McMillan*, 744 F.3d 1033, 1036 (7th Cir. 2014) (Section "2422(b) is violated by *attempts* to persuade, entice,

coerce, or induce a minor to engage in sexual activity" (emphasis added)). Unlike those cases, this case involves a minor engaging in sexual activity with customers and with the defendant, and the defendant using physical violence against minors and adults. Therefore, the umbrella of all Guideline § 2G1.3 offenses is not a helpful comparison. Those defendants are not all similarly situated to this defendant.

## V.     RESTITUTION

Restitution is mandatory in this case pursuant to 18 U.S.C. §§ 1593 and 3663A. Mandatory restitution has several components, including the gross income earned by the victims and any losses proximately caused by the defendant's actions including past and future medical and mental health expenses. A detailed analysis of the government's proposed restitution computation is provided in the Government's Supplement to the Sentencing Memorandum, Dkts. 350 and 357, the Government's Supplemental Versions of the Offense re: Restitution, and during the evidentiary hearing on June 21, 2019, where previous counsel for defendant was present. Dkts. 369, 407. The total amount of restitution sought is $1,649,343.12, joint and several with co-defendant Samuel Nichols. The government also anticipates that Brandon Wright will be ordered to pay restitution, in an amount to be determined, joint and several with Fears and Nichols.

### A.     Gross Income Earned by Victims

Pursuant to § 1593(b)(3), the Court must award to each victim as restitution "the greater of the *gross* income or value to the defendant of the victim's services or labor" or the value of the victim's labor if she were paid minimum wage and overtime.

24

(emphasis added).  Accordingly, the government used the victims' own estimates of their frequency of work and how much the earned for each client to determine an estimate of the victim's gross income, as set forth in detail in the Supplemental Government's Version re: Restitution ("Supp. G.V.").  The figures are as follows: Jameela, $205,200; Michelle, $157,500; Betty Jo, $125,400; Minor A, $57,600; Ciara, $234,000; Marzett, $100,800; Kadeejah, $7,200; Candace, $43,200; Kaila, $72,000; Asia, $21,600; and Christine, $57,600.

### B.    Past Medical Expenses

Another component of mandatory restitution is past medical services for physical, psychiatric, or psychological care.  18 U.S.C. §§ 1593(b), 2259(b)(3)(A).  The government has determined that the following victims have incurred expenses for medical treatment and/or mental health treatment related to their trafficking: Michelle ($13,693.41), Betty Jo ($820.00), and Candice ($2,729.71).[16]

### C.    Future Expenses

Additionally, mandatory restitution includes the future costs of medical or mental health treatment for injuries proximately caused by defendant.  *See* 18 U.S.C. §§ 1593(b), 2259(b)(3)(A).  Restitution is also to include future physical and occupational therapy, housing, child care, lost income, and other losses proximately caused by the trafficking offense.  *See* 18 U.S.C. § 2259(b)(3).  For the reasons set

---

[16] The government is in the process of verifying with the victims that no additional medical/mental health treatment expenses have been incurred since 2019, the date of the government's last filing.  If additional expenses are found, the government will update the Court prior to sentencing.

forth in the government's previous filings, those expenses are estimated to be $50,000 per victim.  *See* Dkt. 350 at 3-8; Gov't Third Supplemental G.V., dated May 30, 2019.

### D.    Total Restitution Figures

Therefore, the total restitution figures are as follows:

| Victim | Total Lost Income | Past Medical/Mental Health Expenses | Future Expenses | Total Restitution Amount for Nichols and Fears (Joint and Several with each other) |
|---|---|---|---|---|
| Jameela | $205,200.00 | | $50,000.00 | $255,200.00 |
| Michelle | $157,500.00 | $13,693.41 | $50,000.00 | $221,193.41 |
| Betty Jo | $125,400.00 | $820.00 | $50,000.00 | $176,220.00 |
| Unique | $57,600.00 | | $50,000.00 | $107,600.00 |
| Ciara | $234,000.00 | | $50,000.00 | $284,000.00 |
| Marzett | $100,800.00 | | $50,000.00 | $150,800.00 |
| Kadeejah | $7,200.00 | | $50,000.00 | $57,200.00 |
| Candice | $43,200.00 | $2,729.71 | $50,000.00 | $95,929.71 |
| Kaila | $72,000.00 | | $50,000.00 | $122,000.00 |
| Asia | $21,600.00 | | $50,000.00 | $71,600.00 |
| Christine | $57,600.00 | | $50,000.00 | $107,600.00 |
| | | | **TOTAL** | **$1,649,343.12** |

## VI.    SUPERVISED RELEASE CONDITIONS

In addition to the term of incarceration, the government believes the Court should impose a term of supervised release for life, which will best protect the public from future crimes by the defendant.  The government has one proposed modification and one proposed addition to the conditions of supervised release proposed by the Probation Office.

In *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the Seventh Circuit held that sentencing Courts must make an independent determination that each condition of supervised release imposed on a defendant is rationally and

reasonably related to the offense conduct and characteristics, and to the sentencing purposes identified by 18 U.S.C. §§ 3583(c) and 3553(a)(1), (a)(2)(C), and (a)(2)(D). *Id.* at 373-74. Additionally, the Court must state the reasons for imposing each condition, and ensure each condition is not broader than necessary to achieve the purposes of sentencing. *Id.*

In light of *Thompson*, asks the Court to impose the conditions of release listed on Exhibit B. Consistent with this Court's standing order, Exhibit B contains each proposed condition as well as the legal or factual support for that condition.

The government's proposed conditions of release are consistent with those proposed by the Probation Office, except that (1) the government proposes an additional condition, Discretionary Condition 2, ordering defendant to make restitution and (2) that the Probation Office's proposed condition Discretionary Condition 6, regarding prohibiting contact with co-defendants and victims, be modified to specifically those individuals by name (rather than a reference to the PSR in the Probation Office's version).

## VII.    CONCLUSION

A sentence of 30 years' incarceration, followed by a lifetime of supervised release, will reflect the seriousness of defendant's heinous crimes, deter the defendant and others from committing sex trafficking, and protect the public from future crimes by the defendant.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:     _/s/ Michelle Petersen_
SARAH STREICKER
MICHELLE PETERSEN
ELIZABETH POZOLO
Assistant United States Attorneys
219 S. Dearborn, 5th Floor
Chicago, Illinois 60604

Dated: April 12, 2022